15-2067 People v. Timothy Herring Council on People v. Herring please approach, identify yourselves, and tell us who you represent. Good morning, Your Honors. I'm Darryl Lowman for the appellant, Timothy Herring. Assistant State's Attorney, Douglas Harbath, on behalf of the people of the State of Illinois. All right. And as I'm sure you both know, the microphones in front of you are for recording purposes only. So during your arguments, if you would keep your voices up, we would appreciate it. And we have read the briefs, very familiar with your case, so you don't need to spend a lot of time on the facts. And Mr. Lowman, how much time would you like? My opening argument, approximately 12 minutes and maybe three for rebuttal. Okay. We won't hold you to that precisely. And Mr. Harbath? About the same, Your Honor, maybe 15 minutes. Okay. All right. And Mr. Lowman, would you like to proceed? Good morning again, Your Honors, and may it please the Court. I'm Darryl Lowman for the appellant, Timothy Herring. I raised five main issues in my brief, as Your Honors are aware, and many, many sub-issues. But today I'd like to focus on the fingerprint in the garbage can and also the cell phone location information. The State emphasized these two to the jury because the balance of its evidence consisted primarily of alleged out-of-court statements submitted through people with a strong incentive to lie. So the State knew that some sort of tangible evidence was necessary to secure a conviction. Since neither the fingerprint nor the cell location information should have come into evidence, this Court should reverse outlay or order a new trial. Turning first to the fingerprint that was found in the garbage cart, the State expresses a great deal of certainty in its appellate brief with respect to the fingerprint, saying, quote, we know exactly where it came from and that it was undeniably compelling physical evidence. But I think it's very telling that the trial essay was not nearly so certain and can't even be admitted to the jury that they don't know where the fingerprint came from specifically and that they don't actually care. Saying in summation, quote, and really does it matter what the piece is? Does it really matter? It was in the garbage can. Does it really matter? And is that of course it matters. If you don't know where the item came from, there's no foundation for the admission of the physical evidence. And if there were items in the garbage can and whether it was the bracket for the mirror or the box containing the assembly where Mr. Herring's fingerprint was located, what difference does it make? I would submit it makes a great deal of difference because the items in the garbage cans are a great number of items in addition to those two, including actual garbage. One of the bins, for example, contained an empty candy bag that was so obviously garbage that the evidence technicians just simply discarded it and didn't inventory it. And then there were other items that were inventory that I would submit are still garbage, like a Cool Ranch Doritos bag or even a torn box. So what? Well, then if I'm a piece of garbage in the alley on the block where my client lives, I'm sure there's my fingerprints in garbage cans all over the neighborhood where I live, on coffee cups and other types of garbage. But that's the point. When the police are investigating this, they come across discarded items in the garbage that look like, and I think Stephen identified some of them as coming from his car, and they locate Mr. Herring's fingerprint on one of those items. What difference does it make which item? And it wasn't, either it was the assembly box or the bracket for the mirror assembly or the box it came in. What difference does it make that it's one or the other? Your Honor raises a very important point, which I would like to clarify. Stephen Peters did not identify any of the items in the garbage carts. He's one of the two decedents in this case, did not testify in this case. So not only was the fingerprint not linked to a specific item in the garbage carts, the items in the garbage carts were not linked to the Mustang. They were found eight houses down from the crime scene and even further from my client's house. My client lives south of the Mustang. The garbage carts would matter where your client lives if the fingerprint is found eight houses down from the crime scene. So it's near the crime scene. Yes. There's no question. And they were seen, he was seen, there was testimony that he was moving a garbage can. There was no testimony that he was moving a garbage can. There was somebody who was moving a garbage can. Well, I would just like to be really clear, Your Honor, the only eyewitness, what passes for an eyewitness in this case is Ms. Peters' mother, who saw a person with a hoodie up who does not match the physical description of my client moving garbage carts. That's true. That is an evidence. There's no evidence that she saw anybody moving a garbage cart. That's correct. And it was found, a garbage can was found eight houses away from the crime scene. It was found eight houses north of the crime scene. My client lives south. This is why this is important. The State's theory with the timing of this doesn't really make any sense. Mr. Peters does not live with his mother. He lives out in the suburbs. So he came coincidentally to his mother's house and saw that his car had been broken into. That's the State's theory of the case. But it would take at least some time for him to call the police. Your Honor, there was testimony that he spoke to a neighbor of his, right? Mr. Peters spoke to his neighbor. He spoke to his neighbor. He told him that there had been burglary of his car, correct? Yes, and I have a separate issue that that wasn't admissible. It's inadmissible hearsay for the proof of it having been asserted, which is one of the many issues that I've raised in this case. But, yes, you're correct. So, I mean, it may be their theory, but they did put on evidence, pretty good evidence, that he went there to his mother's house. Not a coincidence. He went there. He was burglarized. He talked to a neighbor about it. Mr. Peters? Well, I believe the timing is completely coincidental because he was visiting his mother and saw that the car had been coincidentally burglarized. We don't know when. But it would have taken some period of time between the burglary and his arrival, and his arrival and the evidence tech's arrival, because the second victim in this case is an evidence tech, not a patrol officer. He's there dusting for fingerprints and, in fact, had already applied fingerprint powder all over the car. If my client were the person who had been inside the Mustang, he lives right there across the alley slightly to the south. It makes no sense that he would put things in a garbage car as opposed to his own home and then push them eight houses north in the opposite direction of where he lived. Well, if he didn't want them to find them in his house, that would make sense if he had gone in the other direction. That would make perfect sense. But if he didn't want to be found, he would have never returned to the scene, as the state's theory implies. The state says he came back because the officer was going to find his fingerprints on the car, but the fingerprints were never wiped off the car. Probably the person who broke into the car has their fingerprints all over the car. I mean, there were tons of latent prints lifted from all over the car, from the garbage carts, from items in the garbage can, from speakers, which is the most reasonable thing to say came from a car. Right. Speakers, amplifiers from the car. These items had fingerprints on them. They didn't have my client's fingerprints on them. Now, the counterpoint to that would be to say, well, perhaps he was wearing gloves when he did all this. Well, then his fingerprint wouldn't be on the box or the mirror or whatever the other item is. His fingerprint might, however, be on an item of garbage, in an actual garbage can in the alley on the block where he lived. Okay. So that's construing the evidence in the light most favorable to the defendant. And we have to construe the evidence in the light most favorable to the prosecution. Well, yeah. I'm presenting this in the context of my argument with respect to the admissibility of the fingerprint evidence. You always ask why it matters, because that's an important component, too. It's not enough to say it was improperly admitted. It also has to be prejudicial. And this is why. This is the significance, and I'm answering your obvious question. But the legal issue is whether it should have been admitted in the first place. And to admit a physical evidence, you have to have a foundation. You have to have a chain of custody. You can't just say why it matters is an important question. The answer to the initial question is, is it even admissible in the first place? And the answer is no. This is how fingerprints are normally admitted in the vast majority of cases that come before your honors. A witness to a police officer testifies over a criminal physical item, showing you exhibit 1, is this it? Yes. Latent print person comes in. I took a latent print from the object. Is this the object you took it from? Yes. Is this the latent print in exhibit 2? Yes. Then we get a standard from the defendant. And then the expert comes in, testifies, compares 1 to 2. Yes, there's a match at 12 loci, whatever the case may be. That's far removed from what happened in this case. And there's a reason that a trial essay has told the majority we know where it came from. Because they don't know. They had the officer come in and testify. We were coming to garbage carts. Everything there was dumped into two inventories, one ending in 22, one ending in 38. And then lifts were taken, 30, 40, 50 lifts from all the items in the cart, as you would imagine, as you would expect, the vast majority of which were not matched to my client. One fingerprint they claim is a match, but you have the person who lifted the fingerprints testifying to a set of about 10 pictures of lifts. And again, very dramatically, they had goggles passed out to the jury, let the finger point out, look at the fingerprint. Then when the expert came to testify, he didn't refer to any of these fingerprints. He referred to a completely new set of pictures that had no foundation whatsoever. In essence, he was comparing a set of pictures with no foundation to my client's. And he determined that they matched. But it's not, it's simply not admissible. You can't just present anything you want and say that it's a match. You don't know where it came from. Turning to the cell location information, again, just to be specific here with respect to the actual evidence, there's only one call detail record in evidence, State Exhibit 157, which is obtained by Sprint pursuant to an exigent circumstances request. And again, to be clear, there's no argument by the State that exigent circumstances actually existed in this case. They wanted it to move quickly, but exigent circumstances are someone's kidnapped. It's a very, very dangerous, immediate response is required. There's no even allegation that that's true in this case. They didn't have a warrant to get it. Under Riley and Carpenter, it's certainly clear now that a warrant is required. And I would submit that since the 1960s, phone communications generally have been protected by the warrant requirement. There was a narrow exception created in Smith v. Maryland for PEM register and trap and trace information. But there have been no cases, certainly not Supreme Court cases or any sort of Illinois case, saying that the conduct of the State in this case is authorized without a warrant. The State cites in the response to my motion to cite a number of federal cases that were decided after the police officers illegally obtained the information. And how important is that evidence? I mean, does that really have any impact in this case? Because he lived in the area, the cell phone towers were in the area, and the FBI expert really couldn't say much with regard to his location. He didn't want to prove anything one way or the other. So who cared about that evidence? Well, it was important to state because, again, aside from the fingerprint and the cell location information, there's no tangible evidence there. Just a sequence of people with a motive to lie. People who were after a $20,000 reward. People who were literally arrested and brought to the police station as wastes. And that was all argued to the jury? Yes. You shouldn't believe any of these people because they were only motivated to get the money? Yes. The jury didn't buy that? That's true. The way my issues are framed with respect to the first issue, your honors have to look at whether that's enough to prove the corpus delicti of the offense, which is not really a question that's presented to the jury. Okay. The corpus delicti is the commission of a crime, right? When you have two bodies in an alley with bullet holes in their head, that's the corpus delicti, right? No, it's not. It's more than just the commission of the crime. Actually, that's what Laura says. No, it does not. Laura says the commission of the crime plus proof of criminal agency and the identity of the perpetrator. I quote Laura in my brief, paragraph 17 for that proposition. The discussion in Laura of corpus delicti says you only have to have a minimum of evidence connecting defendant to this crime. It's not part of corpus delicti that the state must prove that it was the defendant who committed the crime. That's not part of corpus delicti, is it? To be more specific, it's not part of corpus delicti for the state to prove beyond a reasonable doubt the corpus delicti. But, yes, there's two separate elements. The latter case, Sargent, and the more recent Illinois Supreme Court cases that you're going to look at focus on the first, the act, the fact, what your honors said, the fact the crime occurred and the proof of that. They're sexual assault cases. So if you have a victim testifying I was touched in such and such an area and there's nothing supporting that, that's the question. Only with respect to the first aspect of it. With respect to the second aspect of it, Laura says in paragraph 17, the second aspect of corpus delicti is the identity of the perpetrator. So let's talk about what corroborates, connects, for purposes of corpus delicti, this defendant to the crime. Testimony that he came in shortly after the murders, cut off his braids, right? Tries to go to a barber. Barber says, nah, you got to come back without braids. He goes to somebody else's house and gives him a gun to put in a box along with his clothes and some other items and says, don't tell anybody about this. Somebody will be here later tonight to pick it up. None of that is a confession, right? Why doesn't that tend to connect him to this crime? Let me get into this briefly. With respect to the braids, the testimony is that he cut them off. The barber's testimony, the barber who did not identify my client, said that someone came in and had braids. This would have been on the timeline after he cut them off. So obviously the testimony about him actually cutting his braids off. If you have long braids you can cut off the bottoms and still have the braids on top. And if that's your Honor's interpretation, that's fine. The line goes favorable to the prosecution. That would be relevant to the context of my first argument. But again, today I'm here to argue, and again, I'm happy to discuss anything your Honor's want to discuss, but it does go to the prejudice component of the admission of the fingerprint evidence and the admission of the cell phone evidence because if that's the rest of the evidence, the prejudice case is, for example, Piotrowski with two eyewitnesses saying that's the guy who did it. Again, not like this case where the only eyewitness says there was a guy in an alley with a hoodie who was very short, my client is six feet tall, he was dark skinned, and my client is light skinned. Your Honor, I mentioned the gun. The gun was supposedly picked up by a man who's shorter than my client, who's nicknamed as dark skinned Tim Willis, who was the only person arrested in connection with this offense in addition to my client.  Again, that was all argued to the jury. Again, with respect to the first issue, your Honor's response, the jury decided that the standard with respect to the first issue, you may be correct. With respect to the fingerprint issue, the cell phone issue that I'm not here to discuss, there's still a prejudice component. And the standard for the prejudice component is harmless beyond a reasonable doubt. And in the cases that I cited, including I just referenced Piotrowski, it was determined to be not harmless beyond a reasonable doubt. One, the balance of the other, it's correct. Your Honor shouldn't get what's the other evidence. Piotrowski, the other evidence was two eyewitnesses saying, that's the guy who did it in court, testifying that that's the case. So I would submit that if your Honor is disagreeing on argument one, and find that there was sufficient evidence to convict, that has no impact on issues two, three, four, and five, except with respect to that, now you have to look through a different one. It's not enough to say the jury looked at it, yeah, that's true with respect to the first issue. With respect to the other issues, the question is, is it harmless beyond a reasonable doubt? Is it prejudicial under the Strickland standard for ineffective assistance arguments? Completely different standard, and the notion that the jury looked at it is not enough. Let's look at some of the other evidence. His girls collaborated by a phone record showing his calls to and from various family and friends. This thing. No. Well, you say no. Yes, I do. But it does show. It shows they made phone calls. It shows they made calls. It shows they made calls that testified, correct? It shows they made calls to the families and friends who testified. Yes, and that's not a coincidence, by the way. They got them to testify because they first had the phone records and then arrested everyone on the phone records. But these people also did not want to come to trial. That's right. And they were there. Then we have the fingerprint on the item in the garbage can. We also have the cell phone's presence near the crime scene during the time the crime was committed. We have men's testimony that she had been told about a year before that he was very interested in taking those speakers. And we also have, viewing all that evidence as like most veritable to the state, it seems to me that there's quite a lot in addition to the two pieces of evidence that you talk about. Well, it isn't much good. Well, that's argument one. I'm trying to move on. If your Honor's disagreeing with respect to argument one, that's the standard, the like most veritable to the state. That's not the standard for any of the other arguments. So two of the items Your Honor mentioned are the fingerprint itself and the cell phone location information itself, which the arguments I'm presenting today are those should not have been admitted. So you can act those out too. That leaves you with the output statements. The phone records corroborated that he had phone calls with them. They're not claiming they talked to him on the phone and confessed on the phone. We don't have wiretaps. We don't have the context of the conversations. Most of the phone records are texts. There's no text messages saying, yes, I just shot two people. They're saying that we arranged to meet him, and then we went for a walk, and he confessed. And he was acting paranoid. After smoking marijuana. And cut off his braids and gave him a gun and other items. And while that might be enough to convict, it's not enough to say that any error that happens after this, any amount of process to armless conduct, any amount of improperly admitted hearsay or physical evidence is fine. It's an armless error. That's the actual standard, Applicant Relations 2 through 5. It's not in the light most favorable to the jury. In conclusion, the state's brief contains no valid reason why the court should overlook these deficiencies. The theory makes no sense, and any new arguments they present today are waived. In essence, the law should affirm because a terrible crime has occurred. And a terrible crime has occurred. We're not disputing that. The only issue now and the only issue then is whether Timothy Herring is the person who committed it and whether that was proven through the admission of admissible evidence. It was not. Thank you. Mr. Horvath? Good morning, Your Honors. May it please the Court. Assistant State's Attorney, Douglas Horvath, on behalf of the people of the State of Illinois. The evidence in this case overwhelmingly established the defendant's guilt for the murders of Chicago police officer  Defendant said he was going to hit Sweet Pea for his sounds. Defendant confessed to killing these men to no fewer than five people shortly after the murders. He recruited witnesses to help him dispose of the gun he used and the clothing that he wore. And he tried to disguise himself by cutting his hair. Defendant's fingerprint was found on the proceeds from the burglary in the cell phones, including approximately 250 texts and phone calls. Does your case rely upon or does not rely upon the wearing of gloves by the perpetrator? Does it or does it not? Does it rely on the defendant not wearing gloves? Did he wear any? Which way was it? Well, his fingerprint was found on the murder weapon. You're trying to show that he was not wearing gloves. Is that correct throughout the case? I mean, he was, isn't that right? Ostensibly. Okay. And there were no other fingerprints found other than the fingerprint, one fingerprint. That's correct. In the garbage bin. So how does that make any sense when we know the car had been dusted just before a police officer was shot. One little, very tiny fingerprint. And when he wasn't, in your cases, he wasn't wearing any gloves. And he lives in the neighborhood. He could be going through the garbage. The fingerprints on the car could have been from any number of people. Right, we don't know. And they didn't match the defendant. They didn't match the defendant. Of course they didn't. Okay. But to smash and grab, and we know that this car was burglarized, clearly it's sitting there with glass all over the place and all the proceeds from the car, the speakers, the subwoofers, the wires, and the pile moving your camera, and the box it was in, were in the carts that the defendant was seen pushing away from the scene. Well, we don't know that. He tested. There is no testimony from Mrs. Peters. I mean, in fact, she described the person pushing it as different than what the defendant. So what you just said is not in accord with the facts. She saw the defendant. No. She did not identify the defendant. This woman who had just seen her son murdered was off by three inches, Your Honor. And cases like Slim, discussing the biggest factors, recognized that under these circumstances a witness can't be expected and can't be faulted for even significant differences between the actual perpetrator. She was off by three inches. And the phone call and her testimony was corroborated in every other respect based on defendant's admissions to these five other individuals. The statement that was actually on there, which is highly corroborative, and the jail phone calls that the defendant was recorded as making, where the defendant is essentially admitting to the offense. He's talking about, if that bitch, Trinae, don't come to court, I'm going to be decent. And why is he interested in Trinae not coming to court in Tim Willis's case? Because if she testifies that the defendant gave her the murder weapon, that's evidence, that's what happened. And that's actually what happened in the defendant's case. So what about Mr. Ullman's argument about the fingerprint? That we don't know exactly where it came from because the inventory numbers are off and it shouldn't have been admitted. I'd like to preface my response by pointing out that the context for this claim is ineffective assistance of counsel. It's not whether it was harmless beyond a reasonable doubt and it was a mistake. It's whether counsel was ineffective for failing to seek to suppress the fingerprint. And let me be perfectly clear, the defense counsel in this case committed no oversight. They were not ineffective. They seized on what they recognized was an issue that went to the weight of the fingerprint, not its admissibility. And just so we're clear, the facts are that the evidence technician in this case, Matthew Savage, was the one that recovered the fingerprints and photographed them and assigned them inventory numbers. It wasn't until later that the latent fingerprint examiner, who was Michael Malone, actually examined the print itself. And it was that individual, the examiner, who made a mistake. He was off by two digits. He put down a number ending in 022 instead of 038. And he corrected it before trial. And he corrected it before trial. And I'd like to be clear, this is not an issue of the state doesn't care where the print came from. The state does care where this print came from. And it was made clear at trial. The trial counsel herself recognized that it came on the bracket of the rear view camera. So the fingerprint was on the bracket of the mirror assembly, is that right? Right. And is there anything that tells us that that was already installed in the car or was it still in the box in, like, the trunk of the car, sitting in the garage someplace? I'm sorry. It was recovered from a black bag. And that sort of is the root of the problem, the mistake that Investigator Malone made, that the bag itself contained the bracket and the whole rear view mirror assembly, essentially, and a few other items. And there were also, of course, a lot of other items that were in the cart. So if somebody came in and stole this black bag and got all this stuff and put it in the garbage, that would make sense because the defendant's fingerprints aren't anywhere on the car. It's not like when he was fiddling, trying to disassemble this mirror, he had to touch the windshield or anything else. There's no proof that he was ever in the car. So what you're saying is that he stole this black bag that was full of car stuff and then threw it all in the garbage. Well, it's not – the evidence doesn't show where the actual pile of rear view mirror camera came from. Obviously, the defendant touched it because his fingerprint's on it. And that was, among other items, was placed inside of a black bag. But my colleagues already pointed out he could have been digging through the garbage. People dig through garbage a lot, all the time. Unfortunately, it's hard to imagine why, but they do it. And he might have been, you know, looking for something that he wanted, and then he saw this car stuff and he didn't want car stuff. Again, and I think that that exact argument was raised before the jury and was rejected by the trial court, Your Honor. And I'd like to point out that the vast majority of the defendants – regarding the sufficiency of the evidence – were expressly raised, frequently verbatim, the same exact language in the defendant's brief, were raised by the assistant public defender at trial. The jury heard all those arguments, that maybe these cars were left open and one didn't have a lid and the lid was already open, and that maybe some person came by and, you know, picked up those things and threw them in there. That argument was already presented to the trial for the fact that it was rejected. But I find it really troubling that his one fingerprint was on this one bracket and there's all this other car stuff in the same garbage can and his fingerprints aren't on any of that. Well, the mere absence of a fingerprint doesn't prove a negative. It doesn't prove, like the defendant would like to argue in his opening brief, that because the fingerprints weren't anywhere else on the car or nowhere else, that it couldn't have been him. That just means fingerprints weren't left. I mean, this Court has seen criminal cases time and time again where the State's Attorney's Office will put on a fingerprint examiner to testify how often fingerprints are not left to show that that doesn't mean that someone didn't touch them, that they could be affected by humidity and moisture and perspiration. So the mere absence of fingerprints on the car doesn't mean, I mean, the defendant didn't have to go touching the car, the deck lid or the core panels of the car or the hood of the car, to break in, smash and grab and take speakers, wires or whatever was in the car, including the PAL camera. Or maybe it was on the floor of the garage. There's no evidence that it was actually in the car. Well, presumably the speakers and the mirror assembly were stolen at the same time. That's correct. And his fingerprint was on one part of this equation but not on the other part, not on the speakers, not on the box. That's correct. Not on, maybe on the wires, but who could tell? And I'd like to come back to the strengths of the evidence in this case. The evidence showed that the defendant, as I pointed out earlier, admitted to this crime to no fewer than five people, including his friends and family members and his cousin. Trinae Smith, Diamond Owens, and Cassandra Ridley, individuals that did not flip at trial, they didn't recant, and they had no sort of alleged hope to get reward money. They testified that the defendant was nervous and he was panicked and he was paranoid. When he got in the car, he said, go. He asked if police were equipped with cameras. He drove to Smith's home and he admitted he had just shot two police officers. And he was asking if he was making calls, constantly making calls, which is corroborated by the phone logs, asking if people knew that it was him. And when he was there, he produced the gun and the wires. And as his court pointed out, he cut his hair and then he went to the barber to cut his hair to try to cut the rest of his hair off. The barber did not identify him, though. It's the man that came in, right? Well, the hoodie was his nickname. He didn't identify him in court. He refused to, but he did identify him in a photo array. And he put his initials there. So there's such a high volume of evidence in this case. Neosha Menzies, as his court pointed out, immediately suspected the defendant of committing this murder because he said he wanted to hit Sweet Pea for his sounds months before the actual crime. With regard to the corpus delicti, this court is clear. It is obviously aware that the law holds that the corpus delicti, and now I'm quoting from Furby, actually, the identity of the accused, the ultimate issue, is not considered part of the corpus delicti. Even if it were, the defendant's confessions were corroborated by the forensic evidence, by all the phone records, the 911 calls, his fingerprint, and his own calls that were recorded from jail regarding the evidence and Trinae not coming to court and him acknowledging that the police did not have his gun. With regard to the cell phone evidence, again, that issue, and I can't emphasize this enough, this is in the context of a claim of ineffective assistance of counsel. It's not whether or not the evidence was properly evidenced. Of course, there was no suppression hearing, and no suppression hearing was even required because at the time the historic CSLI was recovered, Carpenter had not come down yet. The overwhelming weight of authority, including every federal circuit court to address this issue, had held that the acquisition of historic CSLI was not a search and a warrant was not required or a showing of probable cause before it could be acquired. Carpenter itself says that the decision is a narrow one and it expressly did not disturb the decisions in Smith and Miller of the third-party doctrine. And the court said, and I quote him from Carpenter, there's a world of difference between the limited types of information in Smith and Miller, regular phone records and some certain bank records, and the exhaustive collection of CSLI. Carpenter itself distinguished between pen register type records, which is what we have, and the defendant has lumped all the cell phone evidence together. There were different types of cell phone evidence that were required. The evidence that was required pursuant to an exigent circumstances request, and incidentally, the state does not waive any argument regarding whether or not exigent circumstances were present in this case. That's a factual determination. It wasn't litigated, and it wasn't litigated because there was no motion, no suppression motion filed, and there was no suppression motion filed because the phone log records, the incoming Alcoin phone calls, were properly obtained without a warrant. They, at the time and to this day, post-Carpenter, can be obtained without a search warrant. Why was there no prejudice to the defendant in the attorneys not having suppressed the location data? There's no prejudice because had defense counsel filed such a motion, Your Honor, there's zero chance that a trial judge, sort of a rogue trial judge, would have granted the motion to suppress the CSOI in the face of overwhelming weight of authority holding that the third-party doctrine applied to CSOI. So even if counsel had moved to suppress this, she had no chance of succeeding. So the prejudice question is not was this evidence, the CSOI evidence, prejudicial. Of course it was prejudicial in the sense that it damaged the defendant's case. It showed him in and around the scene of the crime at the time of the murders, and it showed him going over toward the barbershop at the time of the murders as well. So of course it was damaging, but that doesn't mean it was inadmissible. That doesn't mean that the defendant, in order to show prejudice, would have to show that there's a reasonable likelihood that the trial court would have granted the suppression motion. It can't meet that burden. And I'd like to point out that all of the cases that the defendant files in his reply to the state's response to the motion to cite additional authority, none of them actually hold what the defendant indicates it says that they hold. None of those cases hold that the acquisition, these are all pre-carpenter, mind you, which was the law at the time this case was tried and at the time that the murders were committed. None of those cases hold that a search warrant or a showing of probable cause is required. On the contrary, they all hold just the opposite. And numerous cases that the defendant relies on to suggest otherwise involve the real-time CSLI and the evidence that is essentially akin to a GPS tracker. They are cell-site simulators and basically hijack your phone. You're drawing a distinction between what a third-party cell service provider maintains, which is the information you say is accessible without a warrant, and what's derived from the cell phone itself, which requires a warrant. Well, if you're referring to the physical phone itself, the defendant relies on, are you referring to Riley? So Riley simply held that the search incident to arrest exception doesn't apply to cell phones. So if a defendant is arrested, you can't just go ahead and search this phone that's on this person. That didn't happen in this case. Riley has no application to this case. And I think it's notable that in addressing the alleged prejudice of the evidentiary value of the location information, the defense ignores the phone logs themselves, which, as I indicated earlier, precisely corroborate every single witness that testified that the defendant was calling him in a frenzy or texting. Cassandra Ridley, they were texting about, you know, did you get rid of the clothes? Done. The timing of all that, including the 29-minute period of silence when the defendant murdered these two men, where his phone is obviously switched off. This is not a person. This defendant is not someone that turned his phone off. We know that because there's hundreds and hundreds of phone calls and texts. But during that 29-minute period, we have complete radio silence. It's those logs that were required, even without the CSOI, the phone calls themselves, the incoming and outgoing phone calls, precisely corroborate each of the witnesses' testimony regarding the timing. So for all those reasons, for those stated in our brief, we ask this court to affirm the defendant's conviction for the murder of Chicago police officer Michael Fisk and Stephen Peters. Thank you very much. All right, Mr. Allman, rebuttal? Very early. May it please the court, I have only one point on rebuttal. With respect to the fingerprint evidence, the statement mischaracterizes my argument that it relies on the discrepancy in the inventory number. That's a small part of the argument. The bigger part of the argument is what I actually argued to your honors, that there's a disconnect, a break in the chain of custody between the actual print and what was actually identified by the fingerprint expert in this case. It's true there was an additional problem that on the eve of trial, six days before, Officer Malone got an email from an ASA asking him to change the inventory number to make it look better, but that just shows that there's another mistake, another additional problem with the chain of custody in this case. That wasn't the only issue. Thank you, your honors. Thank you. Thank you both for your arguments and your excellent briefs. We will take the matter under advisement.